UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                     Plaintiff,<br><br>v.<br><br>SARY MATH,<br><br>                     Defendant. | No. CR04-409P<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING DEFENDANT'S MOTION TO SUPPRESS |

This matter comes before the Court on Defendant's Motion to Suppress statements made to Canadian and U.S. border officials and law enforcement personnel after $475,970.00 U.S. currency was recovered from Defendant's vehicle by Canadian border officials during a routine inspection at the Douglas, British Columbia port-of-entry. This Court has reviewed all relevant papers and pleadings in this case. On March 31, April 1, April 5, and April 6, 2005, the Court heard testimony and oral argument in this case. Attorney Kelly Harris represented Plaintiff United States, while attorney Jon Zulauf represented Defendant Sary Math. Agent Chris Koshar, of the U.S. Department of homeland security, Officer David Jellis, of Canadian Customs, Cpl. Karre "Chuck" Kolot, of the Royal Canadian Mounted Police ("RCMP"), Officer Claire McBride, of Canadian Customs, Agent Steven Mittelstaedt, of U.S. Immigration and Customs Enforcement ("ICE"), Agent Kendra Wynn, of ICE, and Defendant Sary Math offered testimony on this matter that was heard by the Court during these four days. Having considered all relevant papers and pleadings, as well as evidentiary testimony

ORDER - 1

by the witnesses listed above, and oral argument by the parties' attorneys, the Court makes the following findings of facts and conclusions of law:

## FINDINGS OF FACT

1. Mr. Math attempted to cross the U.S.-Canadian border into Canada on the evening of June 30, 2004. At the Canadian customs stop, Mr. Math was referred for secondary inspection. There, he encountered Canadian Customs Officer McBride, who asked him standard questions concerning the ownership and contents of the vehicle he was driving.

2. After this conversation, Officer McBride and Officer Jellis (also of Canadian Customs) inspected Mr. Math's car and ran currency and drug dogs through it. In the back seat, the officers noticed a plastic baggie in between the seats that contained U.S. currency. When they tried to lift the seat, they found that it was fastened shut. Both dogs signaled positively that there might be drugs or currency in the car. On the basis of these indicators, Officer McBride had Mr. Math's vehicle moved to a non-public area for a more thorough inspection. Eventually, $475, 970.00 in U.S. currency was recovered from under the backseat of Mr. Math's car.

3. After completing the preliminary inspection of the car, Officers Jellis and McBride returned to the secondary inspection facility, where Mr. Math was waiting. Officer Jellis confronted Mr. Math with the discovery of the baggie and asked him if there was anything that Mr. Math wanted to tell the Canadian customs officials about the currency. Mr. Math told these officials that no one else had access to his vehicle and that he did not know anything about the money.

4. Officer Jellis read Mr. Math his Canadian "charter rights," which informed him that he had a right to be silent, a right to an attorney, and that whatever statements he made could be brought into evidence. Officer Jellis then asked Mr. Math if he would like to speak with an attorney. Mr. Math assented and Officer Jellis helped him to call the free Legal Aid duty

ORDER - 2

      lawyer. Officer Jellis informed the lawyer that Mr. Math was under suspicion of drug smuggling and left Mr. Math in private to converse with his counsel.

5. When Mr. Math finished his conversation, Officer Jellis asked him if he was satisfied with the advice he received, or if he would like to speak with another lawyer. Mr. Math declined the offer and was put into formal detention.

6. Officers Jellis and McBride offered Mr. Math food and drink and checked on him periodically for the next several hours. The conditions of Mr. Math's detention in Canadian custody were humane.

7. During Officers Jellis' and McBride's investigation of Mr. Math, they did not contemplate whether or not the evidence they were gathering would be used in a future U.S. prosecution of Mr. Math. Officer Jellis testified that he had not been trained in relevant U.S. law regarding investigation of individuals stopped at a border crossing.

8. Officers Jellis' and McBride's supervisor contacted the Royal Canadian Mounted Police (RCMP) to request that an investigator be sent to the border to look into whether or not the currency recovered was proceeds of crime.[1]

9. Cpl. Kolot of the RCMP arrived at the border station where Mr. Math was being held around 10 p.m. on the night of June 30, 2004. Once there, Officers Jellis and McBride informed him that they were about to begin an interview of Mr. Math. Cpl. Kolot requested that he be allowed to sit in on the interview.

10. Before the interview began, Cpl. Kolot asked Mr. Math if he had been informed of his rights. Mr. Math expressed some confusion. Nonetheless, Cpl. Kolot testified in court that he determined that Mr. Math was aware of his rights because he had already exercised his right to speak with a lawyer.

---

[1] According to the testimony given in Court by Officer Jellis of Canadian Customs and Cpl. Kolot of the RCMP, transporting undeclared currency across the border into Canada is a civil offense in Canada. However, Possession of the Proceeds of Crime is a separate, criminal offense in Canada.

ORDER - 3

11. Cpl. Kolot also asked Mr. Math for his permission to tape the interview and Mr. Math agreed. During the interview Mr. Math admitted that he knew that he had currency in his vehicle, though he was not aware of the exact amount, and that an acquaintance had paid him $3,000.00 to drive the currency over the Canadian border. Mr. Math also speculated that the money found in his car was, perhaps, related to drugs.

12. At the end of the interview, Cpl. Kolot advised Mr. Math that he was under arrest for Possession of the Proceeds of Crime and gave him the opportunity to speak to another attorney.

13. After Mr. Math finished speaking to the second attorney, Cpl. Kolot asked him if he would mind answering a few more questions. Mr. Math replied that he preferred to exercise his right to silence and that he was tired.

14. Cpl. Kolot returned to the facility where Mr. Math was being held on July 1, 2004, which was Canadian Independence Day. When he arrived there, Mr. Math was on the phone with a private lawyer that his wife had retained for him. When he got off the phone, Cpl. Kolot interviewed him again.

15. Mr. Math was brought to court in Canada on the charge of Possession of Proceeds of Crime on July 2, 2004. After Mr. Math was formally charged, he was released on bail, and escorted in handcuffs back to the U.S. border, where he was put into the custody of the U.S. Immigration and Customs Enforcement ("ICE").

16. No Canadian officials contacted any U.S. officials regarding Mr. Math or his case before July 2, 2004. There was no pre-existing investigation of Mr. Math in either of the two countries before June 30, 2004. The information sharing that occurred between the two countries regarding Mr. Math's case after July 2, 2004 was not a formal "joint investigation," because no letters of accord regarding this matter were exchanged by the U.S. and Canada. The countries have no pre-existing agreement to handle certain types of cases jointly. There was

ORDER - 4

not enough cooperation between the countries in this matter that it could be classified as a "joint venture" under law.

17. When Mr. Math arrived at the ICE border facility, he was handcuffed to a chair in the secondary examination area, which was out of sight of the public.

18. ICE Agents Wynn and Mittelstaedt were sent to the border facility to conduct an interview of Mr. Math. When the agents arrived, Mr. Math was unhandcuffed from the chair. An ICE official searched his pockets and took his Canadian court documents to be photocopied.

19. Before meeting Mr. Math, Agents Wynn and Mittelstaedt knew that he had been arrested in Canada, that currency had been seized, and that he was now being denied entry to Canada.

20. Before the interview began, neither agent informed Mr. Math of his Miranda rights. Agent Mittelstaedt testified that he asked Mr. Math questions specifically formulated for questioning people suspected of money laundering. Agent Wynn testified that she asked Mr. Math what happened to him while he was in Canada.

21. Mr. Math gave a narrative statement detailing his stop at the Canadian border and his subsequent detention and arrest.

22. Agent Wynn was armed during the interview. At the end of the interview, Ms. Wynn informed Mr. Math and the other border officers present that he was free to go. A border officer helped Mr. Math to call a taxicab.

## ANALYSIS

Because Mr. Math made statements to foreign and domestic law enforcement personnel in this case, the determination of whether or not those statements should be suppressed requires two separate analyses.

**I. Statements to Canadian Border and Law Officials**

**A. Suppression under the Vienna Convention**

Defendant observes in his motion that the statements Mr. Math made to Canadian officials were made before Canadian officials informed Mr. Math of his right, under the Vienna Convention,

ORDER - 5

to notify the U.S. consulate of his arrest. The U.S. presented no testimony to contradict this allegation at the hearing on this matter. Nonetheless, the Court must deny Defendant's motion to suppress under the Vienna Convention. An *en banc* panel of the Ninth Circuit held that there is "nothing in the language or operation of the treaty provision to suggest that Article 36 [of the Vienna Convention] was intended to create an exclusionary rule." U.S. v. Lombera-Camorlinga, 206 F. 3d 882, 884 (9th Cir. 2000). The Lombera-Camorlinga court noted that the Vienna Convention only requires arresting officials in countries who are signatories to the treaty to notify a foreign arrestee's home consulate when the arrestee requests such notification. Id. Additionally, the court found that there is no specific temporal element in the Vienna Convention that requires consular notification at the beginning of police questioning. Id. at 886. For these reasons, the Ninth Circuit in that case declined to suppress statements made by a Mexican national to U.S. border officials regarding drugs found in his car. The facts of this case are not different enough from those in Lombera-Camorlinga to compel a different result on the question of suppression. Defendant's motion under the Vienna Convention is therefore DENIED.

**B. Application of U.S. Constitutional Standards to Evidence Obtained by Foreign Officials**

In general, U.S. courts have not applied our Constitution's exclusionary principles under the Fourth, Fifth, and Sixth Amendments to evidence obtained through the acts of foreign officials. U.S. v. LaChapelle, 869 F. 2d 488, 489 (9th Cir). Only two exceptions to this rule are widely recognized: first, where U.S. law enforcement officials are involved in the investigation; and second, where the foreign procedures are so out of step with U.S. due process norms that they shock the conscience. Id.; U.S. v. Covington, 783 F. 2d 1052, 1056 (9th Cir. 1986).

**1. U.S. Involvement**

There was no evidence presented at the suppression hearing that led this Court to find that there was sufficient U.S. involvement in the Canada Customs' and the RCMP's investigation of Mr. Math to justify the suppression of statements made to officials in Canada. For U.S. courts to impose

ORDER - 6

our country's exclusionary rule standards on an investigation that occurs in another sovereign nation, there must be evidence that shows that the operation was a "joint venture" between U.S. and foreign law enforcement officials. U.S. v. Peterson, 812 F. 2d 486, 490 (9th Cir. 1987). The primary purpose of the exclusionary rule is to deter U.S. law enforcement officials from violating an individual's Fourth, Fifth, or Sixth Amendment rights, rather than to protect any personal interest an individual may have in these rights. U.S. v. Janis, 428 U.S. 433, 446 (1976); U.S. v. Calandra, 414 U.S. 338, 348 (1974). Exclusion of evidence by a U.S. court tends to have little effect on the conduct of foreign officials. U.S. v. Chavarria, 443 F. 2d 904, 905 (9th Cir. 1971). Accordingly, where there is no "joint venture" between U.S. law enforcement and foreign officials, a defendant's statement to foreign law enforcement can be admissible if it meets the normal legal standards for trustworthiness. Id.

Defendant argues that in the post-9/11 world there is a new spirit of cooperation between U.S. and Canadian law enforcement units at the border. This increased collaboration and information sharing, the defense implies, has led to a state of affairs where virtually all investigations at the border could be classified as "joint ventures." To bolster this theory, Defendant points to the "Canada-US Smart Border Declaration," the creation of the Integrated Border Enforcement Team (IBET), which is comprised of U.S. and Canadian law enforcement and customs agents, and information-sharing across the border, particularly in money-laundering cases. (Def's. Reply at 9).

The testimony heard by this Court, however, from both U.S. and Canadian officials undermines Defendant's argument. Chris Koshar, U.S. country representative for the Department of Homeland Security (DHS) and ICE in Vancouver, stated that in order for there to be a joint investigation between the U.S. and Canada, the two countries must exchange letters of accord prior to the investigation. Mr. Koshar also testified that there were no standing agreements between the two countries to jointly investigate certain types of crimes. Officers Jellis, of Canadian Customs, testified that he had not been trained in U.S. legal standards. At no time in their investigation of Mr. Math did they contact U.S. officials about Mr. Math. From June 30, 2004 until July 2, 2004, only

Canadian officials were involved in the investigation of Mr. Math.  In fact, both U.S. and Canadian witnesses testified that Canada did not notify the U.S. that they had arrested Mr. Math until he had been in Canadian custody for almost three days.

In deciding whether or not an investigation conducted by foreign officials in cooperation with the U.S. has constituted a "joint venture" such that the exclusionary rule could apply, courts have considered whether U.S. officials have played a substantial role in the investigation, whether the investigation has been labeled as joint investigation by the countries involved, and whether or not the U.S.'s involvement in the case was "subordinate" to that of foreign authorities. Peterson, 812 F. 2d at 490.  In Mr. Math's case, none of these indicators weigh positively in Defendant's favor.  Furthermore, there is simply not enough evidence that increased post-9/11 cooperation with our northern neighbor has become institutionalized to the point that all investigations that take place at the U.S.-Canada border can be considered joint investigations.   Even assuming that the Canadian investigators did not comply with all the procedural requisites of Canadian "charter rights," excluding the evidence that those officials obtained from a U.S. proceeding would have no deterrent benefit on U.S. agents at this time. Having made these findings, the Court must DENY Mr. Math's motion to apply the exclusionary rule to the statements he gave to Canadian officials.

**2. "Shocks the Conscience"/Due Process**

The second method by which a defendant may succeed in having statements made to foreign officials excluded is to show the court that the process by which the foreign officials obtained the statements "shocks the conscience" or otherwise violates the trustworthiness standard that the U.S. requires of confessions. LaChappelle, 869 F. 2d at 490; U.S. v. Emery, 591 F. 2d 1266, 1267 (Ninth Cir. 1978).  In Mr. Math's case, Canadian officials treated him humanely, provided him with opportunities to speak to attorneys, and did not subject him to any conditions, such as harsh lighting, withholding of food or water, or prolonged interrogation, that might have overborne his will.  Although they did not comply with all of the standards that U.S. officials are held to under Miranda and may also have negligently violated some portions Mr. Math's rights under the Canadian charter,

ORDER - 8

the Canadian officials in this case did not commit such grave errors that Mr. Math's statements to them must be deemed unreliable. Indeed, after reviewing the transcripts in this case, the Court's impression is that Mr. Math, once detained, was forthright and cooperative with Canadian officials. His statements, therefore, are found to be voluntary and trustworthy. The procedure that the Canadians used to elicit them in no way "shocks the conscience." Inasmuch as Defendant's motion to suppress statements made by Mr. Math to Canadian officials is also based on this rationale, it is DENIED.

**II. Statements to U.S. ICE Officials**

The Court finds that once Mr. Math was returned to the U.S. side of the border, he should have been read his Miranda rights before any questioning by Agents Wynn and Mittelstaedt. Generally, an individual's rights under Miranda v. Arizona apply when a person is being interrogated by a law enforcement official while in custody. U.S. v. Kiam, 250 F. 3d 1354 (E.D. Penn. 2004). Courts look to the "totality of the circumstances" to determine if a reasonable man would have understood himself to be in custody, or if he would have felt "free to go." U.S. v. McDowell, 250 F. 3d 1354, 1362 (11th Cir. 2001). Similarly, Courts have determined that an interrogation is underway by considering "whether 'under all of the circumstances involved in a given case, the questions are "reasonably likely to elicit an incriminating response from the subject."'" U.S. v. Salgado, 292 F. 3d 1169, 1172 (9th Cir.2002) (quoting U.S. v. Solano-Godines, 120 F. 3d 957 (9th Cir. 1997). The circumstance of custody coupled with official interrogation presents a danger of coercion that requires that an individual be read his Miranda rights before his statements to U.S. law enforcement officials will be allowed into evidence. Illinois v. Perkins, 496 U.S. 292, 297 (1990).

**A. Special Conditions at the Border**

Courts have found that the requirements of Miranda are a bit more lenient at the border, where the United States has a sovereign right to protect itself. U.S. v. Chiochvili, 81 F. Supp. 2d 393, 395 (N.D.N.Y. 1999). When a customs officer stops or detains an individual to ask routine border inspection questions, there is generally no "custody" and Miranda does not apply. See e.g.

ORDER - 9

1  U.S. v. Layne, 973 F. 2d 1417 (8th Cir. 1997).  Courts have applied this principle where the individual
2  voluntarily came to the border and was asked routine administrative questions, or biological
3  information.  Id.; U.S. v. Gupta, 183 F. 3d 615 (7th Cir. 1999).  Routine questioning that customs
4  officers know is also likely to incriminate does not trigger Miranda, where there is no custody and a
5  reasonable person would have felt free to leave.  U.S. v. Manasen, 909 F. 2d 1357 (9th Cir. 1990).
6  However, where there is a particularized suspicion of the individual before questioning began and the
7  person can be considered "in custody," Miranda applies.  See e.g.Kiam, 250 F. 3d 1354; Chiochvili,
8  81 F. Supp. 2d 393.  Mr. Math's interrogation by Agents Wynn and Mittelstaedt satisfies both of
9  these criteria.

10  **B.  Mr. Math's Interrogation**

11  Agent Wynn and Agent Mittelstaedt both testified that before they met Mr. Math they knew
12  of his arrest in Canada, they knew that Canadian officials seized currency form Mr. Math, and they
13  knew that Mr. Math was being denied entry into Canada.  Mr. Math testified that he was transported
14  from Canada to the U.S. in handcuffs and was kept handcuffed to a chair in the U.S. Border facility's
15  secondary inspection area until Agents Wynn and Mittelstaedt arrived.  Before he was interviewed,
16  Mr. Math's pockets were emptied and his Canadian court documents were photocopied.  Although
17  Mr. Math was unhandcuffed for the interview, Agents Wynn was armed during the course of the
18  interview.

19  In an analogous case, a court found that a person suspected of smuggling individuals into the
20  U.S. and who was escorted off of a plane by U.S. customs officials, isolated in the airport's secondary
21  examination room, and questioned by an armed customs official, was "in custody" for the purposes of
22  Miranda. Kiam, 250 F. 3d 1354.  Likewise, in a case where a border agent observed three individuals
23  sneak across the U.S.-Canadian border and  then stopped the car in which they were riding to
24  question them, the agent's questions, which went beyond routine biographical information, combined
25  with his particularized suspicion of the people he had stopped, led the encounter to be classified as an
26  "interrogation" under Miranda. Chiochvili, 81 F. Supp. 2d 393.  The questioning of Mr. Math by

ORDER - 10

Agents Wynn and Mittelstaedt is similar to the one in <u>Chiochivili</u> because the information the agents had regarding Mr. Math should have been enough to create a particularized suspicion in them. Second, the questioning of Mr. Math was not "routine" and the agents knew or should have known that asking him about his experiences in Canada was likely to elicit an incriminating response. As a result, Mr. Math was "in custody" and "interrogated" and should have received <u>Miranda</u> warnings before his interview with Agents Wynn and Mittelstaedt began. Because he did not, his statements to those officials must be suppressed. Defendant's Motion as to these statements is, therefore, GRANTED.

## CONCLUSIONS OF LAW

Mr. Math's Motion to suppress statements he made to Canadian officials, while in their custody is DENIED. The Vienna Convention does not provide a temporal requirement for notice to an arrestee's consulate that would justify suppression of evidence. There is insufficient evidence of a "joint venture" between the U.S. and Canada in their respective investigations of Mr. Math such that excluding evidence gleaned by Canadian officials would have a deterrent effect on U.S. officials. Finally, there was no evidence of Canadian procedures that "shocked the conscience" or undermined the trustworthiness of Mr. Math's statements to Canadian officials. Mr. Math's Motion to suppress the statements he made to U.S. Agents Wynn and Mittelstaedt is GRANTED because they failed to provide him with <u>Miranda</u> warnings, although he was "in custody" and they interrogated him.

The Clerk of the Court shall direct a copy of this order be sent to all counsel of record.

Dated: April 14, 2005.

/s/ Marsha J. Pechman
Marsha J. Pechman
United States District Judge